**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| SHIRLEY A. GROGAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:07CV132 LMB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Shirley A. Grogan for Supplemental Security Income under Title XVI

of the Social Security Act, 42 U.S.C. §§ 401 et seq.  This case has been assigned to the

undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being

heard by consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff has filed a Brief in Support of

Plaintiff's Complaint.  (Document Number 13).  Defendant has filed a Brief in Support of the

Answer.  (Doc. No. 17).

## Procedural History

On October 7, 2004, plaintiff filed her application for benefits, claiming that she became

unable to work due to her disabling condition on September 5, 2003.  (Tr. 45-48).  This claim

was denied initially, and following an administrative hearing, plaintiff's claim was denied in a

written opinion by an Administrative Law Judge (ALJ), dated November 30, 2006.  (Tr. 19, 39-

43, 8-18).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council

of the Social Security Administration (SSA), which was denied on July 27, 2007. (Tr. 5, 2-4). Thus, the decision of the ALJ stands as the final decision of the Commissioner. <u>See</u> 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on May 11, 2006. (Tr. 255). Plaintiff was present and was represented by counsel. (<u>Id.</u>). The ALJ began the hearing by admitting the exhibits into the record. (<u>Id.</u>).

Plaintiff's attorney then examined plaintiff, who testified that she was 48 years of age. (Tr. 256). Plaintiff stated that she attended school until the eighth grade and did not obtain her GED. (<u>Id.</u>). Plaintiff testified that she has not received any specialized training. (<u>Id.</u>). Plaintiff stated that she was able to read the newspaper. (<u>Id.</u>). Plaintiff testified that she was able to write a letter although she was not able to spell very well. (<u>Id.</u>). Plaintiff stated that she was able to perform simple mathematics. (<u>Id.</u>). Plaintiff testified that she does not drive because she becomes dizzy and she does not feel like she would be safe on the road. (Tr. 257). Plaintiff stated that she was five feet, seven inches tall and weighed 140 pounds. (<u>Id.</u>).

Plaintiff testified that she has difficulty breathing. (<u>Id.</u>). Plaintiff stated that she has had breathing problems for eight to ten years. (<u>Id.</u>).

Plaintiff testified that she last worked some time prior to her alleged onset date of September 5, 2003. (Tr. 258).

Plaintiff stated that she takes Nitroglycerin[1] spray and Nitroglycerin pills for chest pain. (Id.). Plaintiff testified that she uses a nebulizer and two inhalers for her breathing problems. (Id.). Plaintiff stated that she experiences shortness of breath when she bends over to tie her shoes. (Id.). Plaintiff testified that she has to rest between tying each shoe. (Id.). Plaintiff stated that dust, smoke, and heat bother her. (Id.). Plaintiff testified that she is unable to take showers because the steam bothers her. (Id.). Plaintiff stated that she is able to walk thirty to forty feet on flat ground before she experiences shortness of breath. (Tr. 259).

Plaintiff testified that she has experienced back problems for about eight years. (Id.). Plaintiff stated that she has deteriorating discs in her lower back. (Id.). Plaintiff testified that she has also been diagnosed with arthritis in her back. (Id.). Plaintiff stated that her back pain starts in her tailbone and goes up to her neck. (Tr. 260). Plaintiff testified that her back pain causes her left leg to occasionally go out. (Id.). Plaintiff stated that she also experiences leg cramps that cause her to wake during the night. (Id.). Plaintiff testified that she can only sit for fifteen to twenty minutes before she has to stand and rest her back against the wall. (Id.).

Plaintiff stated that she wears braces for carpal tunnel syndrome. (Id.). Plaintiff stated that Dr. George Samuel has recommended surgery for her carpal tunnel syndrome. (Tr. 261). Plaintiff testified that Dr. Samuel ordered nerve conduction studies. (Id.). Plaintiff stated that she underwent nerve conduction studies at Poplar Bluff Neurological Center. (Id.). Plaintiff testified that she drops objects she holds in her hands because she loses feeling in her fingers. (Id.). Plaintiff stated that her right hand is worse than her left hand. (Id.). Plaintiff testified that she is

---

[1]Nitroglycerin is indicated for acute relief of an attack or prophylaxis of angina pectoris due to coronary artery disease. See Physician's Desk Reference (PDR), 1258 (59th Ed. 2005).

- 3 -

right-hand dominant.  (Id.).

Plaintiff stated that she sees Mrs. Penrod, a counselor, for depression and anxiety.  (Tr. 262).  Plaintiff testified that Mrs. Penrod comes to Dr. Samuel's office a few days a week.  (Id.). Plaintiff stated that she tried to obtain Mrs. Penrod's records but was unable to reach Mrs. Penrod.  (Id.).  Plaintiff testified that she began seeing Mrs. Penrod four months prior to the hearing and that she has seen her on two occasions.  (Id.).  Plaintiff stated that she believed Mrs. Penrod was a psychiatrist.  (Id.).  Plaintiff testified that Mrs. Penrod does not prescribe medications.  (Id.).  Plaintiff stated that she does not take any medication for depression.  (Id.).

Plaintiff testified that she experiences chest pain.  (Tr. 263).  Plaintiff stated that she takes Nitroglycerin spray.  (Id.).  Plaintiff testified that she also takes a Nitroglycerin pill daily.  (Id.). Plaintiff stated that she has a heart disease that causes her arteries to harden.  (Id.).  Plaintiff testified that the Nitroglycerin stops the pain.  (Id.).  Plaintiff stated that she takes the Nitroglycerin as needed.  (Id.).  Plaintiff testified that she sometimes goes several weeks without taking it and other times takes it three times in one day.  (Id.).  Plaintiff stated that exertion, including walking, causes her chest to hurt.  (Id.).

Plaintiff testified that she has a seizure disorder.  (Id.).  Plaintiff stated that she becomes dizzy and shaky when she has a seizure.  (Tr. 264).  Plaintiff's attorney asked plaintiff whether her doctors have suggested that she was experiencing anxiety attacks rather than seizures.  (Id.). Plaintiff testified that her doctors indicated that she was having seizures.  (Id.).  Plaintiff stated that she has experienced three seizures.  (Id.).  Plaintiff testified that the seizures last about five minutes.  (Id.).  Plaintiff stated that the seizures have not been a major problem because they have only occurred on three occasions.  (Id.).

Plaintiff testified that her last position was at Hart's, which is a furniture factory. (Id.). Plaintiff stated that she used a staple gun and nail gun to assemble furniture at this position. (Id.).

Plaintiff testified that she worked for Ball Brothers, a mill, for a short period of time. (Tr. 265). Plaintiff stated that she stacked boards when they came out of the mill at this position. (Id.).

Plaintiff testified that she worked at Diagnostic Properties, a construction company, where she painted and stained doors. (Id.).

Plaintiff stated that Hart's was the last place she worked. (Id.). Plaintiff testified that she quit Hart's because she missed a lot of work due to illness and lack of transportation. (Id.). Plaintiff stated that she was really too sick to work anyway. (Id.).

Plaintiff testified that she worked at Current River Nursing Home the longest length of time, which was a little more than one year. (Id.). Plaintiff stated that she worked at Current River Nursing Home about ten years prior to the hearing. (Id.). Plaintiff testified that she started in housecleaning at Current River Nursing Home and she moved to the position of laundry aide. (Id.).

Plaintiff stated that she does not have any side effects from her medications. (Tr. 266). Plaintiff testified that she used to take a nerve pill that she had to stop taking because it made her crazy. (Id.).

Plaintiff stated that she did not have difficulty performing her daily activities. (Id.). Plaintiff testified that she only did a little at a time. (Id.). Plaintiff stated that she has difficulty tying her shoes. (Id.). Plaintiff testified that she has problems fastening buttons if the buttons are tight. (Id.).

The ALJ stated that he would send plaintiff for a psychological evaluation. (Tr. 267).

**B.    Relevant Medical Records**

The record reveals that plaintiff presented to George P. Samuel, M.D. at the Samuel Medical Clinic for various complaints from 2001 until the date of the hearing. (Tr. 127-81). Plaintiff was diagnosed with chronic obstructive pulmonary disease (COPD)[2] and consistently complained of shortness of breath. (Tr. 167-68). On August 16, 2002, plaintiff complained of a cough and reported vomiting up blood. (Tr. 168). Plaintiff's liver panel was within normal limits. (Id.).

On October 21, 2002, plaintiff complained of shortness of breath, headaches, and pain in her left shoulder, elbow, wrist, and hand. (Id.). Upon examination, plaintiff had normal grip strength and normal reflexes. (Id.). An x-ray of plaintiff's left hand was within normal limits. (Id.). Dr. Samuel's assessment was neuropathy[3] and COPD. (Id.).

On January 9, 2003, plaintiff complained of pain in the shoulder, neck, and ribs. (Id.). Plaintiff reported that she had fallen and hit her head two weeks prior. (Id.). Upon examination, plaintiff had normal reflexes and full range of motion in her neck. (Id.). Plaintiff had a wheeze[4]

---

[2]General term used for those diseases with permanent or temporary narrowing of small bronchi, in which forced expiratory flow is slowed, especially when no etiologic or other more specific term can be applied. See Stedman's Medical Dictionary, 554 (28th Ed. 2006).

[3]A classic term for any disorder affecting any segment of the nervous system. See Stedman's at 1313.

[4]A whistling, squeaking, musical, or puffing sound made on exhalation by air passing through the fauces, glottis, or narrowed tracheobronchial airways. See Stedman's at 2150.

and rhonchi[5] in her chest.  (Id.).  Dr. Samuel prescribed additional medication.  (Id.).

On February 4, 2003, plaintiff had a wheeze and dry cough.  (Tr. 167).  Dr. Samuel's impression was COPD.  (Id.).  Plaintiff received medication refills in March 2003.  (Id.).  Plaintiff failed to attend a scheduled appointment in April 2003.  (Id.).

Plaintiff presented to the emergency room at Ripley County Memorial Hospital on May 13, 2003, with complaints of shakiness, nausea, dizziness, and chest heaviness.  (Tr. 240).  Plaintiff reported that she had experienced a seizure-like episode with shaking of the right arm, and no loss of consciousness.  (Id.).  It was noted that plaintiff smelled of alcohol and that plaintiff admitted that she had been drinking beer.  (Id.).  Plaintiff reported that she smoked one package of cigarettes a day and drank three to four beers a day.  (Id.).  Upon examination, plaintiff had scattered rhonchi and scattered expiratory wheezes throughout both lung fields.  (Tr. 241).  Plaintiff indicated that she had smoked cigarettes most of her life.  (Id.).  Plaintiff had normal range of motion in her joints and normal muscle strength in all four extremities.  (Id.).  A chest x-ray was normal.  (Tr. 246).  Dr. Samuel's impression was alcohol withdrawal, delirium and tremors, and chest pain.  (Tr. 241).

Plaintiff presented to Dr. Samuel for a physical on June 19, 2003.  (Tr. 166).  On the same date, Dr. Samuel completed a form at the request of the state agency with regard to plaintiff's application for state financial assistance.  (Tr. 197-98).  Dr. Samuel noted that plaintiff "states [she] has been dizzy, feels as if she could pass out.  Nervous and shaky.  Had Seizure 2 months

---

[5]An added sound with a musical pitch occurring during inspiration or expiration, heard on auscultation of the chest and caused by air passing through bronchi that are narrowed by inflammation, spasm of smooth muscle, or presence of mucus in the lumen.  See Stedman's at 1693.

ago. States [she] has chest pain all the time." (Tr. 197). Dr. Samuel indicated that plaintiff had

an expiratory wheeze and slight shortness of breath. (Id.). Dr. Samuel stated that plaintiff has

chest pain off and on, which can occur while at rest or with exertion. (Id.). Dr. Samuel noted

that plaintiff also suffered from depression and seizures. (Tr. 198). Dr. Samuel stated that

plaintiff needs help with ambulation when dizzy. (Id.). Dr. Samuel diagnosed plaintiff with chest

pain-angina,[6] seizure disorder, depression, and hypertension. (Id.). He indicated that plaintiff was

taking Advair,[7] Atenolol,[8] and Nitroglycerin spray. (Id.). Dr. Samuel expressed the opinion that

plaintiff had a mental and physical disability that prevented her from engaging in employment or

gainful activity. (Id.). Dr. Samuel indicated that plaintiff's disability would be expected to last

twelve or more months. (Id.).

Plaintiff presented to the Ripley County Memorial Hospital emergency room on October

2, 2003, with complaints of facial pain after falling and hitting her face. (Tr. 236). Upon

examination, plaintiff had a laceration on her right cheek. (Tr. 237). X-rays of plaintiff's face and

skull were normal. (Tr. 176, 238). Plaintiff's wound was cleaned and bandaged. (Tr. 239).

Plaintiff missed a follow-up appointment with Dr. Samuel on October 3, 2003. (Tr. 166).

Plaintiff presented to Dr. Samuel on October 4, 2003. (Id.). Upon examination, Dr. Samuel

noted that plaintiff had a laceration on her face. (Id.). On October 8, 2003, Dr. Samuel noted

---

[6]A severe, often constricting pain or sensation of pressure, usually referring to angina pectoris. See Stedman's at 85.

[7]Advair is indicated for the long-term maintenance treatment of patients with asthma. See PDR at 1391.

[8]Atenolol is a beta-blocker indicated for the treatment of angina and hypertension. See PDR at 3296.

that the laceration was healing.  (Id.).

On December 27, 2003, plaintiff presented to Dr. Samuel with complaints of wheezing, a fever, sore throat, and a cough.  (Tr. 165).  Dr. Samuel prescribed an antibiotic and advised plaintiff to quit smoking.  (Id.).

On January 8, 2004, plaintiff complained of a cough, wheezing, and shortness of breath. (Tr. 164).  Upon examination, plaintiff had a scattered wheeze and her throat was red.  (Id.).  Dr. Samuel's impression was acute bronchitis,[9] rule out pneumonia.  (Id.).  Dr. Samuel recommended further laboratory testing.  (Id.).  Plaintiff missed a scheduled appointment with Dr. Samuel on January 15, 2004.  (Id.).

Plaintiff presented to the emergency room on February 28, 2004, with complaints of cough and vomiting blood.  (Tr. 229-34).  Upon examination, plaintiff had rhonchi and rales.[10] (Tr. 229).  Plaintiff underwent a chest x-ray, which was normal.  (Tr. 233).  The impression of the examining physician was chronic bronchitis and GERD.[11]  (Tr. 230).  Plaintiff was discharged with medication.  (Tr. 234).

Plaintiff presented to Dr. Samuel on March 12, 2004, with complaints of back and left hip pain.  (Tr. 164).  Upon examination, plaintiff's left hip was tender.  (Id.).  An x-ray of the lumbar

---

[9]Inflammation of the mucous membrane of the bronchi.  See Stedman's at 270.

[10]Ambiguous term for an added sound heard on auscultation of breath sounds; used by some to denote rhonchus and by others for crepitation.  See Stedman's at 1626.

[11]Gastroesophageal reflux disease (GERD), is a syndrome due to structural or functional incompetence of the lower esophageal sphincter, which permits retrograde flow of acidic gastric juice into the esophagus.  See Stedman's at 556.

spine revealed moderate degenerative disc changes at L4-5 and L5-S1[12] and mild degenerative arthritic changes with the hip joints. (Tr. 175). X-rays of the left hip revealed mild left hip arthritis. (Tr. 174). Dr. Samuel's assessment was lumbar spine strain and left radiculopathy.[13] (Id.). He recommended heat and bed rest and prescribed Naprosyn.[14] (Id.).

Plaintiff presented to the emergency room on May 10, 2004, with complaints of shortness of breath and breast pain and discharge. (Tr. 220). Upon examination, no breast lump was found and no discharge was expressed. (Tr. 221). Plaintiff's blood alcohol level was .295. (Id.). Plaintiff was diagnosed with mild mastitis,[15] alcoholism, and alcohol intoxication. (Id.).

Plaintiff presented to the emergency room on July 23, 2004, with complaints of chest pain. (Tr. 203-04). Upon examination, plaintiff had a regular heart rate and rhythm with an occasional extra systole and a 2/6 murmur. (Id.). Plaintiff had some scattered rales in her lungs. (Id.). Plaintiff's blood alcohol level was .245. (Id.). An EKG and chest x-ray were normal. (Tr. 205). The diagnosis of the examining physician was alcohol intoxication, chest pain, and history of hypertension. (Tr. 204). Plaintiff was given Nitro spray and was counseled on Alcoholics Anonymous and alcohol reduction. (Id.). Plaintiff failed to attend a scheduled follow-up

---

[12]The back is comprised of the cervical, thoracic and lumbar regions. In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum. See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

[13]Disorder of the spinal nerve roots. See Stedman's at 1622.

[14]Naprosyn is indicated for the treatment of arthritis. See PDR at 2875.

[15]Inflammation of the breast. See Stedman's at 1161.

appointment with Dr. Samuel on July 26, 2004. (Tr. 164).

Plaintiff returned to the emergency room on August 6, 2004, with complaints of chest pain occurring off and on for two weeks. (Tr. 186). Upon examination, plaintiff's heart rate and rhythm were normal, with no murmurs, clicks, gallops, or rubs. (Tr. 187). Plaintiff had normal joint range of motion. (Id.). An EKG and chest x-ray revealed no abnormalities. (Id.). Plaintiff's blood alcohol level was .205. (Tr. 190). A nurse noted that plaintiff threatened to leave if she could not smoke. (Tr. 184). The impression of the examining physician was atypical chest pain, alcoholic intoxication, alcoholic dependent syndrome, and alcoholic gastritis.[16] (Tr. 188). Plaintiff was discharged with instructions to follow-up with Dr. Samuel. (Id.).

Plaintiff presented to Dr. Samuel on September 8, 2004, with complaints of hearing loss, a sore throat, and cough. (Tr. 163). Dr. Samuel's assessment was acute bilateral ear infection and acute respiratory infection. (Tr. 163). Dr. Samuel prescribed antibiotic medication. (Id.).

On September 22, 2004, plaintiff presented to Dr. Samuel with reports of vomiting blood. (Tr. 162). Upon examination, plaintiff had redness in her ears and was tender over her abdomen and epigastric area. (Id.). Dr. Samuel's assessment was abdominal pain, vomiting blood, respiratory infection, sinusitis, and a history of alcohol abuse. (Id.).

Plaintiff underwent an x-ray of her abdomen on September 23, 2004, which revealed nonobstructive bowel gas pattern and calcifications in the pelvis probably representing phleboliths.[17] (Tr. 171). A chest x-ray revealed no evidence of an acute cardiopulmonary

---

[16]Inflammation, especially mucosal, of the stomach. See Stedman's at 790.

[17]A calcific deposit in a venous wall or thrombus; commonly seen on abdominal radiographs in the lower pelvic region. See Stedman's at 1481.

process. (Tr. 172).

Plaintiff presented to Dr. Samuel on February 7, 2005, with complaints of sore throat, cough, shortness of breath, and dizziness. (Tr. 139A). Plaintiff also indicated that she needed a form completed for Medicaid. (Id.). Upon examination, plaintiff's throat was red, her nose was runny, and rhonchi were noted. (Id.). Dr. Samuel's assessment was acute respiratory infection, sinusitis, chronic bronchitis, and hypertension. (Id.). Dr. Samuel advised plaintiff to quit smoking. (Id.).

On February 21, 2005, plaintiff complained of headaches and swollen legs. (Tr. 140). Upon examination, plaintiff had a red throat, runny nose, and left leg edema. (Id.). Dr. Samuel's assessment was pedal edema,[18] respiratory infection, and sinusitis. (Id.). Dr. Samuel advised plaintiff to quit smoking. (Id.).

On April 26, 2005, plaintiff presented to Dr. Samuel's office with complaints of chest congestion and difficulty breathing. (Tr. 141). Upon examination, plaintiff had a respiratory wheeze. (Id.). A chest x-ray revealed no evidence of acute cardiopulmonary process. (Tr. 151). The assessment of the nurse practitioner was acute bronchitis, acute respiratory infection, and COPD. (Id.).

On July 28, 2005, plaintiff presented to Dr. Samuel with complaints of back pain and redness in her face. (Tr. 142). Upon examination, plaintiff had tenderness in her abdomen and her face was red. (Id.). Dr. Samuel's assessment was acute respiratory infection, facial rash, COPD, low back pain, and joint pain. (Id.). He recommended laboratory testing. (Id.).

On August 4, 2005, plaintiff complained of a cough. (Tr. 143). Upon examination,

_____

[18]Accumulation of fluid in the feet. See Stedman's at 612.

plaintiff had an expiratory wheeze and runny nose. (Id.). Dr. Samuel's impression was COPD and bronchitis. (Id.). Dr. Samuel advised plaintiff to quit smoking and prescribed an Albuterol inhaler.[19] (Id.).

Plaintiff presented to Dr. Samuel with complaints of sore throat and cough on August 18, 2005. (Tr. 144). Dr. Samuel's assessment was acute respiratory infection and sinusitis. (Id.).

On August 24, 2005, plaintiff complained of numbness and tenderness in her hands. (Tr. 136). Dr. Samuel's assessment was carpal tunnel syndrome. (Id.). He recommended nerve conduction studies and wrist braces. (Id.).

On October 27, 2005, plaintiff complained of increased anxiety, headaches, depression, and abdominal pain. (Tr. 135). Upon examination, plaintiff had an expiratory wheeze and tenderness over her abdomen and back. (Id.). An x-ray of plaintiff's chest was normal. (Id.). Dr. Samuel's assessment was acute respiratory infection, sinusitis, headaches, depression, carpal tunnel syndrome, and hypertension. (Id.). Dr. Samuel refilled plaintiff's medications. (Id.).

On November 21, 2005, plaintiff complained of swelling in her face, hands, and feet and shortness of breath. (Tr. 134). Upon examination, plaintiff had edema in her lower extremities. (Id.). Plaintiff underwent a chest x-ray which could not be adequately evaluated. (Tr. 148). It was noted that an abnormality could not be ruled out. (Id.). Dr. Samuel's assessment was uncontrolled hypertension and pedal edema. (Tr. 134). Dr. Samuel refilled plaintiff's medications. (Id.).

On November 30, 2005, plaintiff complained of chest pain. (Tr. 133). Dr. Samuel's

_____

[19]Albuterol is indicated for the relief of bronchospasm in patients with asthma. See PDR at 1180.

- 13 -

assessment was arteriosclerotic heart disease[20] with angina. (Tr. 133). Dr. Samuel ordered an EKG. (Id.). Plaintiff underwent an EKG on December 2, 2005, which revealed a normal ejection fraction, mild concentric left ventricular hypertrophy, mild tricuspid regurgitation, and a small pericardial effusion. (Tr. 147).

Plaintiff presented to Dr. Samuel on December 20, 2005, at which time plaintiff had scattered rhonchi in her chest and no bruising over the chest wall. (Tr. 132). Plaintiff underwent a chest x-ray, which revealed no evidence of acute cardiopulmonary process. (Tr. 145). Dr. Samuel's assessment was chest pain and acute bronchitis. (Tr. 132).

On February 6, 2006, plaintiff complained of headaches, shortness of breath, lower back pain, neck pain, and nerves. (Tr. 131). Upon examination, plaintiff had an expiratory wheeze, and tenderness over her cervical and lumbar spine. (Id.). Dr. Samuel's assessment was low back pain, neck pain, and acute respiratory infection. (Id.). Dr. Samuel recommended heat for plaintiff's back pain. (Id.).

Plaintiff presented to Dr. Samuel on February 14, 2006, at which time she had an expiratory wheeze. (Tr. 130). Dr. Samuel's assessment was acute bronchitis and COPD. (Id.). Dr. Samuel advised plaintiff to stop smoking. (Id.).

On February 28, 2006, plaintiff reported that she was breathing better and had no chest pain. (Tr. 129). Upon examination, plaintiff had a decreased expiratory wheeze. (Id.). Dr. Samuel's assessment was COPD and bronchitis, improving. (Id.). Dr. Samuel advised plaintiff to stop smoking. (Id.).

On March 28, 2006, plaintiff presented for medication refills. (Tr. 128). Upon

_____

[20]Hardening of the arteries. See Stedman's at 144.

examination, plaintiff's right wrist was tender.  (Id.).  Dr. Samuel's assessment was hypertension, COPD, and carpal tunnel syndrome.  (Id.).

On May 8, 2006, plaintiff complained of chest pains, shortness of breath, cough, and lung pain.  (Tr. 127).  Upon examination, plaintiff had an expiratory wheeze.  (Id.).  Dr. Samuel's assessment was acute bronchitis, rule out pneumonia, and carpal tunnel syndrome.  (Id.).  Dr. Samuel advised plaintiff to stop smoking and prescribed medications.  (Id.).

Plaintiff presented to Thomas J. Spencer, Psy.D., for a psychological evaluation at the request of the Commissioner on June 21, 2006.  (Tr. 121-26).  Dr. Spencer noted that, although plaintiff had been diagnosed with COPD six years prior, plaintiff continued to smoke one package of cigarettes a day.  (Tr. 125).  Plaintiff indicated that she was hospitalized a week prior due to her breathing problems and stated that she was "kinda under the influence too."  (Tr. 121).  Plaintiff stated that she often felt depressed, although the episodes were typically short lived.  (Tr. 125).  Plaintiff admitted to contemplating suicide although she had never made an attempt.  (Id.).  Plaintiff reported feeling hopeless and helpless at times but otherwise felt "normal."  (Id.).  Plaintiff reported back pain and difficulty sleeping due to back pain.  (Id.).  Plaintiff indicated that she drank upwards of a twelve-pack of beer a night but stated that as long as she drank beer she was "okay."  (Id.).  Dr. Spencer noted that plaintiff wheezed throughout the interview and a noticeable tremor was observed.  (Id.).  Plaintiff presented in a disheveled manner and smelled heavily of cigarette smoke.  (Id.).  Upon mental examination, plaintiff's insight appeared relatively intact while she demonstrated questionable judgment.  (Tr. 123).  Plaintiff's affect was neutral and she denied thoughts of suicide.  (Id.).  Dr. Spencer administered the Wechsler Adult Intelligence

Scale-III (WAIS-III), which revealed a Full Scale IQ of 67.[21] (Id.). Dr. Spencer found minimal

to moderate impairment with regard to memory. (Tr. 124). Dr. Spencer diagnosed plaintiff with

depressive disorder, not otherwise specified; alcohol abuse versus dependence; rule out substance

induced mood disorder; and borderline intellectual functioning. (Tr. 125). Dr. Spencer assessed a

GAF[22] of 50-55.[23] (Id.).


### The ALJ's Determination

The ALJ made the following findings:

1.      The claimant alleges she has been disabled since September 2003.

2.      The claimant has not engaged in substantial gainful activity since 1995.

3.      The medical evidence establishes that the claimant has a severe combination of
impairments chronic obstructive pulmonary disease, borderline intellectual
functioning, mild to moderate degenerative disease of the hips and lumbar spine, an
alcohol abuse disorder and episodic depression-possibly substance induced, but
that she doses not have an impairment or combination of impairments listed in, or
medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.      While the claimant had symptoms and limitations, the allegations of symptoms and

---

[21]An IQ range of 71-84 denotes Borderline Intellectual Functioning, whereas an IQ of 70
and below denotes Mental Retardation. Diagnostic and Statistical Manual of Mental Disorders
(DSM-IV), 45 (4th Ed. 1994).

[22]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool
wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a
hypothetical continuum of mental health-illness" which does "not include impairment in
functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of
Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[23]A GAF score of 41-50 indicates "serious symptoms" or "any serious impairment in
social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at
32. A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial
speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school
functioning (e.g., few friends, conflicts with peers or co-workers)." Id.

limitations totally precluding the ability to work are not consistent with the evidence as a whole, persuasive or credible.

5.       The claimant has the residual functional capacity to perform the physical exertion and non-exertional requirements of work except for heavy, strenuous or complicated work. The claimant can stand and walk intermittently throughout an 8 hour work day with normal breaks and a lunch period, sit throughout a work day, and lift and carry up to 20 pounds occasionally and 10 pounds frequently. The claimant is limited to simple work. (20 CFR 416.945).

6.       With that residual functional capacity, the claimant can perform her past relevant work as housekeeper/laundress as she performed it. The claimant did not sustain her burden of proving that she cannot perform her past relevant work.

7.       The claimant's residual functional capacity for the full range of light and sedentary work is reduced by her limitation to simple work.

8.       The claimant is 48 years old, which is defined as a younger individual (20 CFR 416.963).

9.       The claimant has an 8th grade limited education (20 CFR 416.964).

10.      There is no evidence documenting transferable skills.

11.      Based on a capacity for the full range of light and sedentary work and the claimant's age, education, and work experience, section 416.969 of Regulations No. 16 and Rules 202.17 and 201.18 Tables No. 1 & 2, of Appendix 2, Subpart P, Regulations No. 4 direct findings that the claimant is not disabled.

12.      The claimant's non-exertional restriction to simple work does not compromise her ability to perform the jobs administratively noted by Rules 202.17 and 201.18.

13.      Using Rules 202.17 and 201.18 as a framework for decision making there are a significant number of jobs in the national economy that the claimant can perform. Those Rules satisfy the Commissioner's burden on the other work issue should the burden shift to the Commissioner.

14.      The claimant was not under a disability, as defined in the Social Security Act, at any time through the date of this decision (20 CFR 416.920(f&g)).

15.      No basis was demonstrated for reopening and revising any of the claimant's previous applications for Supplemental Security Income Benefits or a Period of Disability and Disability Insurance Benefits.

(Tr. 17-18).

The ALJ's final decision reads as follows:

> It is the decision of the Administrative Law Judge that, based on the application for supplemental security income filed on October 7, 2004, the claimant has not been disabled, as defined in section 1614(a)(3)(A) of the Social Security Act, at any time through the date of this decision.

(Tr. 18).

## Discussion

### A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry." Id.

**B.    The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or

equals one of the listed impairments, the claimant is conclusively presumed to be impaired. <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. <u>See</u> 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. <u>See</u> <u>id.</u> If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. <u>See</u> 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. <u>See</u> <u>id.</u> Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. <u>See</u> <u>Beckley v. Apfel</u>, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. <u>See</u> 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. <u>See</u> <u>id.</u> Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. <u>See</u> 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000). Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. <u>See</u> 20 C.F.R. §§

404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Pratt, 956 F.2d at 834-35; Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

## C.    Plaintiff's Claims

Plaintiff argues that the ALJ erred in determining plaintiff's residual functional capacity. Plaintiff also contends that the ALJ erred in finding that plaintiff was capable of performing her past relevant work.

The ALJ made the following determination regarding plaintiff's residual functional capacity:

> [b]ased on all of the above, it is found that the claimant could not engage in heavy, strenuous or complicated work, but that she can perform simple, light and sedentary work. Her combined physical impairments rule out heavy and strenuous work, but there is nothing wrong with her to prevent her from standing and walking intermittently throughout an 8 hour work day with norm al breaks and a lunch period, sitting throughout a workday, and lifting and carrying up to 20 pounds occasionally and 10 pounds frequently. Exertionally she has the ability to perform a full range of light and sedentary work. Due to her borderline intellectual functioning she is limited to simple work.

(Tr. 15).

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

"A treating physician's opinion is generally entitled to substantial weight; however, such an opinion is not conclusive in determining disability status, and the opinion must be supported by medically acceptable clinical or diagnostic data." Davis v. Shalala, 31 F.3d 753, 756 (8th Cir. 1994). Further, such opinions may also be discounted when a treating physician renders inconsistent opinions. See Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000). An ALJ is also free to reject the conclusions of any medical source if those findings are inconsistent with the record as a whole. See Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001). "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (quoting Kelley, 133 F.3d at 589).

Here, the ALJ did not cite any medical evidence in support of his residual functional capacity determination. In fact, the ALJ provided no explanation whatsoever for his determination. Dr. Samuel was the only physician who provided any opinion regarding plaintiff's ability to function in the workplace. On June 19, 2003, Dr. Samuel completed a form at the request of the state agency with regard to plaintiff's application for state financial assistance. (Tr. 197-98). Dr. Samuel noted that plaintiff had an expiratory wheeze and slight shortness of breath. (Id.). Dr. Samuel stated that plaintiff has chest pain off and on, which occurs both at rest and with exertion. (Id.). Dr. Samuel noted that plaintiff also suffered from depression and seizures. (Tr. 198). Dr. Samuel diagnosed plaintiff with chest pain-angina,[24] seizure disorder, depression, and hypertension. (Id.). Dr. Samuel expressed the opinion that plaintiff had a mental and physical disability that prevented her from engaging in employment or gainful activity. (Id.). Dr. Samuel

---

[24]A severe, often constricting pain or sensation of pressure, usually referring to angina pectoris. See Stedman's at 85.

indicated that plaintiff's disability would be expected to last twelve or more months. (Id.).

The ALJ indicated that he was assigning "very little weight" to Dr. Samuel's opinion because whether plaintiff is disabled is an issue reserved to the Commissioner. (Tr. 15). The ALJ stated that Dr. Samuel appeared to rely on plaintiff's subjective complaints of dizziness, seizures, and chest pain rather than any objective abnormalities. (Id.). The ALJ also noted that Dr. Samuel did not provide any specific functional limitations.

Although the ALJ provided sufficient reasons for assigning little weight to Dr. Samuel's opinion, Dr. Samuel was plaintiff's only treating physician. There is no opinion by any other physician, treating or consulting, regarding plaintiff's ability to function in the workplace. Consultative psychologist Dr. Spencer diagnosed plaintiff with depressive disorder, not otherwise specified; alcohol abuse versus dependence; rule out substance induced mood disorder; and borderline intellectual functioning; and assessed a GAF of 50-55. (Tr. 125). Dr. Spencer, however, did not provide an opinion regarding plaintiff's ability to function in the workplace. As such, there is no medical evidence in the record suggesting that plaintiff can, or cannot, perform sedentary work. At most, the ALJ determined what plaintiff can do based on the subjective complaints that the ALJ found credible, but the RFC must be based on some medical evidence; if there is no such evidence, the RFC "cannot be said to be supported by substantial evidence." Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995).

An ALJ has a duty to obtain medical evidence that addresses the claimant's ability to function in the workplace. See Hutsell, 259 F.3d at 711-712; Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). Here, the ALJ's residual functional capacity assessment fails Lauer's test that the residual functional capacity be supported by *some* medical evidence. See Lauer, 245 F.3d

at 703.

Accordingly, the court will order that this matter be reversed and remanded to the ALJ in order for the ALJ to formulate a new residual functional capacity for plaintiff, based on the medical evidence in the record and to order additional medical information addressing plaintiff's ability to function in the workplace. If the ALJ determines that plaintiff is unable to perform her past relevant work, then he should obtain testimony from a vocational expert due to the presence of non-exertional impairments.

## Conclusion

In sum, the decision of the ALJ finding plaintiff not disabled is not supported by substantial evidence. The ALJ failed to properly develop the record by not obtaining necessary medical evidence addressing plaintiff's ability to function in the workplace. The ALJ's assessment of plaintiff's residual functional capacity was not based on substantial medical evidence in the record thereby producing an erroneous residual functional capacity. For these reasons, this cause will be reversed and remanded to the ALJ for further proceedings consistent with this Memorandum. Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this __26th__ day of March, 2009.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE